**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

FILED

98 NOV 17 AM 11: 27

U.S. DISTRICT COURT
N.D. OF ALABAMA

CARY W. ORR,                      )
                                  )
        Plaintiff,                )
                                  )
vs.                               )  Civil Action No. 97-S-2088-NE
                                  )
DECATUR CITY BOARD OF             )
EDUCATION,                        )
                                  )  **ENTERED**
        Defendant.                )
                                     NOV 1 7 1998

**MEMORANDUM OPINION**

Cary W. Orr is a former custodial employee for the Decatur City Board of Education. His complaint contains six claims: racial discrimination in violation of Title VII; disparate treatment in violation of 42 U.S.C. § 1983; breach of contract; equitable estoppel; violation of the Alabama Fair Dismissal Act, Alabama Code § 36-26-100 *et seq.* (1975); and, violation of his due process rights under the Fourteenth Amendment to the Constitution of the United States. This action is before the court on motions for partial summary judgment filed by both parties. Plaintiff seeks summary judgment as to his claims under the Fair Dismissal Act and the Fourteenth Amendment. Defendant seeks summary judgment for plaintiff's claims of breach of contract, equitable estoppel, Fair Dismissal Act, Fourteenth Amendment, and plaintiff's § 1983 claims, to the extent it is based on rights arising under Alabama's Fair Dismissal Act.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Id.* In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, "the burden shifts to the nonmovant to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita*

2

*Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587,
106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).   In meeting its
burden, "the nonmoving party may avail itself of all facts and
justifiable inferences in the record taken as a whole."   *Tipton v.*
*Bergrohr GMBH-Siegen,* 965 F.2d 994, 998 (11th Cir. 1992)(citing
*United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993,
994, 8 L.Ed.2d 176 (1962)).

     "'The evidence of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his favor.'"   *Tipton,* 965
F.2d at 999 (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513).
Even so, a "mere 'scintilla' of evidence supporting the [nonmoving]
party's position will not suffice; there must be enough of a
showing that the jury could reasonably find for that party."
*Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990)(citing
*Anderson,* 477 U.S. at 242, 106 S.Ct. 2505).   "Where the record
taken as a whole could not lead a rational trier of fact to find
for the non-moving party, there is no genuine issue for trial."
*Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

     With those standards in mind, the court now proceeds to
summarize the undisputed facts or, if disputed, to frame them in a
light most favorable to plaintiff.

3

## II. STATEMENT OF FACTS

Cary W. Orr began his employment with the Decatur City Board of Education at the start of the 1992-93 school year, on August 3, 1992.[1]  He was hired as a custodian and was assigned to work at Decatur High School.[2]  Orr's original employment contract was for ten months (212 days) and he was paid at a rate of eight dollars per hour.[3]  Orr was assigned to the Business and Education area within Decatur High School.[4]  The principal of Decatur High School at the time of Orr's hiring was James Milner and the custodial supervisor was Mr. Laney.[5]  In July 1993, Principal Milner was replaced by Timonthy Lull.[6]  Shortly thereafter, Mr. Laney retired and was replaced by  Johnny Hayes.[7]  Orr received a satisfactory performance rating, on April 23, 1993, following his first year of service.[8]  His performance rating decreased in 1994, however, and again on his evaluation dated May 4, 1995.[9]

---

[1] Houston Affidavit, Exhibit 1.

[2] Plaintiff's Deposition at 16.

[3] Houston Affidavit, Exhibit 1.

[4] Lull Deposition at 72-73.

[5] Plaintiff's Deposition at 17, B.L. Davis Deposition at 40-41.  No first name for Mr. Laney is given in the record.

[6] Lull Deposition at 17.

[7] *Id.* at 18.

[8] B.L. Davis Deposition, Exhibit 5.

[9] B.L. Davis Deposition, Exhibits 6, 7.  In his performance rating report dated May 4, 1994, Orr received two "needs to improve" ratings along with one "unsatisfactory."  Exhibit 6.  The report of May 4, 1995 contained one "improving," four "needs improving," and one "unsatisfactory" ratings.  Exhibit 7.

4

During February of 1995, an incident involving Orr occurred at Decatur High School. A student reported that Orr received a "weapon" from another student.[10] The "weapon" was a box cutter that contained a razor blade. The student reported the incident to Assistant Principal Mike Ward, who in turn reported to Principal Timothy Lull. The student reported that Orr agreed to return the box cutter to the student after school.[11] A written policy concerning weapons was in force at Decatur High School at the time of the incident.[12] Assistant Principal Ward investigated the student's report. Orr had placed the box cutter in his storage area, rather than delivering it to the school's office and informing Principal Lull of the circumstances.[13] In his statement concerning the incident, Orr said he intended to turn the box cutter over to Principal Lull. A meeting was held concerning the incident on February 16, 1995.[14] No other problems involving Orr occurred.[15]

In late April of 1995, Assistant Superintendent Sam Houston and Principal Lull held a staffing conference. During this meeting Lull expressed his concern about renewing Orr's employment contract

---

[10] Lull Deposition at 65.

[11] Id. at 65-68.

[12] Id. at 68.

[13] *Id.* at 68.

[14] *Id.* at 74.

[15] *Id.* at 75.

5

for the 1995-96 school year. Following the conference, Principal

Lull submitted a written list to Houston confirming those employees

whose employment contracts were to be renewed and those whose were

not.[16]   Orr's name appeared on the non-renewal list.   Interim

Superintendent Charles H. Howard recommended to the Decatur City

Board of Education on May 23, 1995, that Orr not be re-employed for

the 1995-96 school year. Orr was informed by letter dated May 24,

1995, that his employment contract was not renewed for the 1995-96

school year.[17]  The letter stated:

> At its meeting of May 23, 1995, the Decatur City
> Board of Education did not renew your contract for the
> 1995-96 school year.
>
> We appreciate the services you have rendered to the
> Decatur City School System.

(Houston Affidavit, Exhibit 3.)  Orr's last day of work during the

1994-95 school year was June 9, 1995.[18]

After receiving the letter, Orr met with Principal Lull.  Orr

also approached the Principal at Austin High School, Richard Pace,

and the custodial supervisor, Leon Davis, about the possibility of

transferring to Austin.[19]   Decatur High School Principal Lull

testified that he received an inquiry from Principal Pace during

the Spring of 1995 regarding Orr being transferred to Austin High

[16] Houston Deposition at 28-29.

[17] Houston Affidavit, Exhibit 3.

[18] Houston Affidavit at ¶ 7.

[19] Pace Deposition at 15-17; Plaintiff's Deposition at 36-40.

6

School the following year.[20] Following this conversation, Principal Lull submitted a "transfer request" for Orr's transfer, along with a "payroll change" form.[21] According to Principal Lull, he did not recommend Orr for transfer to Austin; rather Lull informed Principal Pace of the problems with Orr. Lull testified that he marked the "I do [recommend transfer]" box[22] on the transfer request form, simply because he had to do so in order for Orr to be able to be considered for transfer. According to Orr, Custodial Supervisor Leon Davis informed him during the month of May and prior to his receipt of his non-renewal letter, that he would have a job at Austin before the end of the 1994-95 school year.[23] Based on Leon Davis's statement, Orr interpreted the non-renewal letter to mean that he was terminated at Decatur High School, but still had a job at Austin High School.[24]

Assistant Superintendent Houston received the transfer request around the same time as Principal Lull's recommendations. At the time Houston received the transfer request, he was aware Lull was

---

[20] Lull Deposition at 78-80.

[21] B.L. Davis Deposition, Exhibit 21.

[22] See B.L. Davis Deposition, Exhibit 21. The transfer request form contains a recommendation section which the supervisor or principal submitting the form must mark either that they "do" or "do not" recommend approval of the transfer request. See also text at note 27 infra.

[23] Plaintiff's Deposition at 40.

[24] Id. at 42.

7

not recommending Orr for renewal.[25]  Houston did not consider the
two forms to be inconsistent with one another, however.[26]  According
to Houston, a transfer request is initiated by an employee and is
only a request to be considered for a transfer.  Houston also did
not have a problem with Principal Lull having signed the request.
Houston explained that a principal's signature solely suggests that
he had no problem with an employee's request for a transfer.[27]

Principal Pace interviewed Orr during the summer of 1995.
Following the interview, Pace recommended to Superintendent Davis
that Orr be employed at Austin High School.[28]  Orr met with
Superintendent Davis during late July or early August,[29] to discuss
the possibility of continued employment at Austin High School.  Orr
had been informed by both Pace and Leon Davis that they were ready
to hire him, but there was a problem at the central office with his
paperwork.[30]  Plaintiff surreptitiously recorded his meeting with
Superintendent Davis with a concealed tape recorder.[31]  During their
meeting, Superintendent Davis spoke to Principal Pace and informed
Pace that he could go ahead and hire Orr at Austin.[32]    O r r

---

[25] Houston Deposition at 30.

[26] *Id.* at 31.

[27] *Id.* at 31-32.

[28] Pace Deposition at 28.

[29] The record does not establish the exact date Orr and B.L. Davis met.

[30] Plaintiff's Deposition at 43.

[31] *Id.* at 43-46.

[32] *Id.* at 51.

8

began work at Austin High School on August 31, 1995.[33]  He was

assigned to work the night shift along with Angel Leisure.[34]  Once

he began work at Austin, Orr was treated like any other regular

employee.  He received the same paycheck as other employees, he had

the same employee number,[35] the same deductions were made to his

paycheck,[36] and he retained his accumulated sick leave.[37]

Tension existed within the custodial staff at Austin High

School, however. [38]  There had been several grievance hearings with

the board of education.[39]  Orr confronted several custodians the

evening of September 15, 1995.[40]  According to Orr, he had been

wrongly accused of stealing food from the storage closets of other

custodians, of being a spy for the NAACP, and a fellow custodian,

Ronald Leeth, "rolled his eyes" at Orr and "never wanted to

speak."[41] The custodians present reported the incident to Custodial

Supervisor Leon Davis on Monday, September 18, 1995.  Davis in turn

informed Principal Pace of what had transpired.  Pace and Davis

---

[33] B.L. Davis Deposition at 63.

[34] Plaintiff's Deposition at 62.

[35] An employee number is a number assigned to a person who has received a payroll check from the Board of Education.  See B.L. Davis Deposition at 76.

[36] Houston Deposition at 61-62.

[37] *Id.* at 94.

[38] Pace Deposition at 53.

[39] *Id.* at 54.

[40] According to Principal Pace, Angel Leisure, Carol Strickland, Rick Graham, and Diedra Clay were present during the conversation.  Pace Deposition at 62-63.

[41] Plaintiff's Deposition at 67.

9

spoke with Orr to hear his description of the incident.   Pace
expressed his concerns over the incident and told Orr he would be
turning the matter over to the central office.[42]   Following the
meeting, Davis scolded Orr, telling him he thought Orr had been
rude and insubordinate during the meeting.   Orr returned to Pace's
office and apologized for his earlier behavior and tone of voice.[43]
Principal Pace then met with the custodians as a group.[44]   According
to Pace, the custodians informed him:

> [t]hat they [the custodians] were sitting there [in the
> break room] waiting to clock out and that Cary [Orr] came
> in and began fussing and complaining about the little man
> [Ronald Leeth] and something about being accused of going
> into someone's storage closet and eating food that was
> there, and used a lot of profanity and made some comments
> about if the little man [Leeth] wanted some of his ass,
> come on, he could have it, in a threatening manner.

(Pace Deposition at 64.)    After hearing their account of the
incident, Principal Pace asked each custodian to write a statement
concerning their recollection of the incident.[45]

---

[42] *Id.* at 72.

[43] *Id.* at 76.

[44] Pace Deposition at 63.

[45] Each of the custodians submitted a written statement.  Rick Graham's
statement reads as follows:

> On Friday September 15, 1995 while sitting in the time clock room at
> the end of my shift Cary [Orr] entered.  At approximately 5:20 pm he
> started ranting and raving about several things.  He complained that
> whoever said he had gone into peoples closets and eaten this damned
> food was a damned liar.   He stated that he didn't know us well
> enough to eat food he found in our closets and that for all he knew
> you (at this point he looked directly at Carol) had some strange
> disease.

10

Pace withdrew his recommendation for Orr's employment on September 21, 1995, following the advice of Assistant Superintendent Houston and Superintendent Davis.[46]   The issue of Orr's termination was brought up at the September 25, 1995 board meeting, but was tabled until the next meeting.[47]  Pace told Orr his recommendation for employment had been withdrawn on September 29, 1995.  He gave Orr the option of resigning.[48]  According to Orr, he refused to resign and continued to believe he  had a job until October 4, 1995, when he received a letter from Superintendent Davis stating:

> On August 31, 1995, you began work as a custodian at Austin High School.  At that time, it was anticipated that I [Davis] would recommend your employment to the Decatur City Board of Education and that the Board would approve such recommendation.

He further stated that if the man that rolled his eyes at him (calling the individual a mother fucker) wanted a piece of his ass he could have it.  He further stated that the damned twins didn't get him his job and no mother fuckin' N.A.A.C.P. got him his damned job, he got it on his own.

He was pacing the room like a caged animal during this time waven his clenched fists in the air in threatening gestures.  he never used the name of the man to whom he addressed the statement.

The foul language written in this statement were those used by Cary.  This account is factual to the best of my recall some four days after the incident.  I may have forgotten details but the worst was easy to recall.

B.L. Davis Deposition, Exhibit 26.

[46] Pace deposition at 107, 120-124.  The "Memo" from Richard Pace directed to Sam Houston dated September 21, 1995, stated: "[b]ecause of some problems that occurred at Austin on Sept. 15, I'm withdrawing my recommendation in which I asked that Carey Orr be employed as Custodian."  Pace Deposition, Exhibit 5.

[47] Houston Deposition at 56; Walter's Affidavit, Exhibit 2.

[48] Pace Deposition at 116.

11

> I regret to inform you that I have decided not to
> recommend your employment to the Decatur City Board of
> Education. You will be paid for your work to date.
> However, we will no longer need your services after this
> date.

(B.L. Davis Deposition Exhibit 8.) Assistant Superintendent Houston delivered Davis's letter to Orr at the entrance to Austin High School on October 4, 1995.[49] At that point, Orr accepted that he was no longer employed by the Decatur City Board of Education.[50] Orr then filed a complaint with the NAACP.[51]

Orr asserts that he gave up an employment opportunity in Oklahoma based upon his belief that he had a job at Austin High School for the 1995-96 school year.[52] A friend of Orr's, Derrick Macklin, worked for TCI Construction, and offered Orr a job at its Oklahoma construction site. Orr contends he gave the job serious consideration; however, he never knew the hourly wage for the job, nor did he know where the construction site was located within Oklahoma.[53] Orr stated in his deposition that he did not accept the offer "because I have a family." Other than the job in Oklahoma, Orr could not recall submitting any other job applications during

---

[49] Plaintiff's Deposition at 80.

[50] *Id.* at 81.

[51] *Id.* at 82.

[52] *Id.* at 94-96.

[53] *Id.* at 98-104.

12

the Summer of 1995.[54]

Orr received a paycheck on September 29, 1995, for his work at Austin High School between August 14th and September 15th.[55] According to Assistant Superintendent Houston, Orr received a regular paycheck prior to October 4, 1995, in anticipation of board action ratifying his employment. Orr's non-ratification, however, complicated the payment process for the board.[56] To remedy the situation, Houston suggested during the board meeting held November 9, 1995 that, since Orr's reemployment had not been ratified by the board, he should be compensated as a contract worker for the remaining payment due to him.[57] The board agreed by resolution:

Assistant Superintendent Houston presented a resolution to the Board regarding a custodial employee at Austin High School. Upon a motion by Mrs. Mooneyham, duly seconded by Mr. Sykes, the following resolution was unanimously adopted by those present:

WHEREAS Cary Orr has performed custodial services at Austin High School; and

WHEREAS such services were performed at the request of the principal of Austin High School in anticipation that the Superintendent would recommend, and the Board would approve, the hiring of Mr. Orr as a permanent employee; and

WHEREAS the Superintendent did not recommend and the

[54] *Id.* at 104.

[55] B.L. Davis Deposition, Exhibit 10.

[56] Houston Deposition at 63-64.

[57] *Id.* at 86.

13

Board did not hire Mr. Orr as a permanent employee, but
the Board nevertheless believes that, under the
circumstances, Mr. Orr has a just claim against the Board
for the reasonable value of the services performed by him
and that said claim should be paid;

NOW, THEREFORE, BE IT RESOLVED by the Decatur City
Board of Education that the Superintendent be and he is
hereby authorized to pay Cary Orr the reasonable value of
the services performed by Mr. Orr as a custodian at
Austin High School, and the Board finds that the
reasonable value of such services is the same rate of pay
that Mr. Orr would have received had he been employed by
the Board during said period of time.

(Walter's Affidavit Exhibit 2.) The Board of Education issued Orr

a check for "contracted services" on November 9, 1995,[58] and again

on November 15, 1995.[59] Orr received a COBRA notice, informing him

of his rights as a departing employee of the Decatur City Board of

Education to continue his medical insurance, on November 27, 1995.[60]

Orr filed a charge of discrimination with the EEOC on March

29, 1996. After receiving his notice of right to sue on May 13,

1997, he filed the present action.

## III. DISCUSSION

### A. Fair Dismissal Act

The Alabama "Fair Dismissal Act," codified at Alabama Code §

36-26-100 et seq. (1975), provides non-teacher employees of public

school systems "a fair and swift resolution of proposed employment

---

[58] B.L. Davis Deposition, Exhibit 11.

[59] B.L. Davis Deposition, Exhibit 12.

[60] B.L. Davis Deposition, Exhibits 13, 14.

14

terminations." *Clayton v. Board of School Commissioners of Mobile County*, 552 So.2d 152, 154 (Ala. 1989)(quoting *Bolton v. Board of School Commissioners of Mobile County*, 514 So.2d 820, 824 (Ala. 1987)). In order to come within the protection of the Fair Dismissal Act, a person must be an "employee" of a public school system. The term "employee" is defined in Alabama Code § 36-26-100 as:

> all persons employed by county and city boards of education ... who are employed as bus drivers, lunchroom or cafeteria workers, maids and janitors, custodians, maintenance personnel, secretaries and clerical assistants supervisors and all other persons not otherwise certified by the state board of education.

The Fair Dismissal Act also sets forth the period of time such employees must serve in a "probationary" status; in pertinent part, § 36-26-101 provides that:

> (a) All employees as defined in section 36-26-100 shall be deemed employed on a probationary status for a period not to exceed three years from the date of his or her initial employment, or a lesser period which may be fixed by the employing authority.

> . . .

> (c) At any time during the employee's probationary period, the employing authority may remove an employee by furnishing said employee written notification at least 15 days prior to the effective day of termination.

The Supreme Court of Alabama has said on repeated occasions that the Fair Dismissal Act "is not a model of legislative clarity" and,

15

therefore, it has "indulged in judicial construction to impart 'reasonableness' into its language." *Clayton*, 552 So. 2d at 154 (quoting *Bolton*, 514 So.2d at 824).

The Fair Dismissal Act is unlike the Teacher Tenure Act, which is codified at Alabama Code §§ 16-24-1 through -38 (1975), with respect to the means of renewing an employee's employment contract. The Teacher Tenure Act contains an automatic contract renewal provision, while the Fair Dismissal Act does not. Therefore, for purposes of the Fair Dismissal Act, an employee's contract must be renewed at the end of each year during the probationary period.

Under the terms of the Fair Dismissal Act, an employee's employment contract can be terminated in two ways: 1) during the first three years, the board of education can dismiss an employee by written notification at least 15 days prior to the effective date; or 2) simple expiration of the one year employment contract and the failure of the superintendent and board of education to reemploy the employee for the following year.

The issue before this court, then, is whether the plaintiff was an "employee" under the Fair Dismissal Act upon his final separation from the Decatur City Board of Education on October 4, 1995. If he was an employee, plaintiff was entitled to rights under the Fair Dismissal Act as a nonprobationary employee. If, on the other hand, plaintiff was not an employee, he had no property

16

interest in his continued employment, and the Board of Education is not liable under the Fair Dismissal Act.

Defendant contends that plaintiff was not formally employed for the 1995-96 school year as required by statute. Plaintiff, on the other hand, argues that the defendant is attempting to achieve a probationary period longer than three years: plaintiff contends he was initially employed in July of 1992 and not terminated until October 4, 1995: more than three years after his initial employment.

It is undisputed that plaintiff's contract was not renewed as of May 24, 1995. Plaintiff contends the nonrenewal letter was ambiguous and did not adequately notify him that he was no longer employed by the Decatur Board of Education. The evidence before the court, however, is to the contrary. The letter clearly stated plaintiff's employment contract would not be renewed for the 1995-96 school year and that his services would no longer be needed by the Decatur City Board of Education.

Plaintiff next contends that custodial supervisor Leon Davis told him in the Spring of 1995 that he would have a job at Austin High School in the Fall. Plaintiff further contends Principal Pace and Superintendent Davis represented that he was employed by allowing him to begin working at Austin High School on August 31, 1995.

17

The superintendent and the board of education must act jointly
to employ an individual, however. Alabama Code § 16-12-16 states,
in pertinent part:

> [t]he city superintendent of schools shall <u>nominate</u> in
> writing <u>for appointment by the city board of education</u>
> <u>all</u> principals, teachers, supervisors, attendance
> officers, <u>janitors and</u> all <u>other employees of the board</u>
> and shall assign to them their positions, transfer them
> as the needs of the schools require, <u>recommend</u> them for
> promotion, suspend them for cause and <u>recommend</u> them for
> dismissal, ...  [Emphasis supplied.]

The superintendent must, therefore, "recommend" the person for
employment ("appointment by the city board of education"), and the
board must concur with the superintendent's recommendation, for an
individual to be legally employed in accordance with the statute.
Representations made by any other person (*e.g.*, the superintendent,
a school principal, or custodial supervisor) are not alone
sufficient to establish an employment relationship.  *See Marsh v.*
*Birmingham Board of Education*, 349 So.2d 34 (Ala. 1977).  "Any oral
agreement to reemploy between the [custodian] and the
superintendent [is] a nullity without the concurrence of the
board."  *Branch v. Greene County Board of Education*, 533 So.2d 248,
252 (Ala. Civ. App. 1988).

It is clear that Superintendent Davis never recommended to the
Decatur City Board of Education that plaintiff be reemployed.  It
also is clear the board did not take any action to reemploy

18

plaintiff. Defendant does not dispute that, upon beginning work at Austin High School, plaintiff was treated the same as any other custodian. Defendant instead argues that it did so because Superintendent Davis then intended to recommend plaintiff to the board for reemployment. Davis was unable to follow through with his recommendation, however, because two weeks after plaintiff began work at Austin, Principal Lull withdrew his recommendation for plaintiff's employment.

Thus, plaintiff never became an "employee" of the Decatur City Board of Education within the meaning of the Alabama Fair Dismissal Act, and no action or statement by Principal Pace, custodial supervisor Leon Davis, or even Superintendent Davis can alter that outcome. None of these individuals, whether acting alone or in concert with one another had the statutory authority to rehire plaintiff without the concurrence of the board of education. Plaintiff thus ceased being an "employee" of the Decatur City Board of Education on June 9, 1995.[61]

Even if this court accepted plaintiff's argument that he was effectively reemployed by the Decatur City Board of Education on August 31, 1995, and ultimately terminated on October 4, 1995, plaintiff still would not meet the "period not to exceed three

_____

[61] See note 18 and related text *supra*.

years" requirement set forth in Alabama Code § 36-26-101(a), to acquire nonprobationary status.

The Supreme Court of Alabama interpreted the term "years" to refer to calendar, and not school years in *Uwakolam v. Huntsville City Board of Education*, 554 So.2d 1036 (Ala. 1989). The court said that "[w]hen the court is called upon to construe a statute, the court has a duty to ascertain and effectuate the legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained." *Id.* at 1037 (citing *Ex Parte Holladay*, 466 So.2d 956 (Ala. 1985)). The court referred to Alabama Code § 1-1-1(16) for guidance in determining the intended meaning of the word "years"; that statute provides:

**Section 1-1-1. Meaning of certain words and terms.**

The following words, whenever they appear in this Code, shall have the signification attached to them in this section unless otherwise apparent from the context:

. . .

(16) YEAR. The word 'year' means a calendar year; but, whenever the word 'year' is used in reference to any appropriations for the payment of money out of the treasury, it shall mean fiscal year.

The Supreme Court of Alabama further interpreted the phrase "period not to exceed three years" as not requiring three consecutive years of probationary service from the date of the employee's initial

20

employment.  *See Clayton v. Board of School Commissioners of Mobile County*, 552 So.2d 152 (Ala. 1989).

The record before the court establishes that plaintiff was initially employed by the Decatur City Board of Education on August 3, 1992.  Plaintiff's employment contract was for  a fixed term: 10 months (212 days) each calendar year.  He was notified on May 24, 1995 that the contract would not be renewed.  Thus, plaintiff was not dismissed: rather, his employment contract was not renewed, and his employment expired on the date specified in his contract for the 1994-95 school year.  Therefore, the board was not required to give plaintiff the 15-day written notice required by Alabama Code § 36-26-101(c).  Even so, the Board notified plaintiff of his nonrenewal on May 24, 1995, and his last day of work was June 9, 1995: 16 days after notification of nonrenewal.  As of June 9, 1995, plaintiff still needed 54 days to acquire nonprobationary status.

According to plaintiff, he became reemployed at Austin High School on August 31, 1995.  Plaintiff therefore needed to work 54 days to meet the statutory requirement for nonprobationary status. In other words, plaintiff needed to work through October 24, 1995, to acquire the rights and protection provided under the Fair Dismissal Act.  The record reflects that plaintiff's last day of work at Austin High School was October 4, 1995: some 20 days short

21

of meeting the statutory requirement.

Accordingly, plaintiff's motion for summary judgment as to the
Fair Dismissal Act claim (Claim V) is due to be denied.
Defendant's motion for summary judgment as to the Fair Dismissal
Act (Claim V) is due to be granted, along with Claim II to the
extent plaintiff's claim of § 1983 liability is based on the Fair
Dismissal Act.

## B.  Equitable Estoppel

The Supreme Court of Alabama discussed the doctrine of
equitable estoppel in *Mazer v. Jackson Insurance Agency*, 340 So.2d
770 (Ala. 1976), stating:

> [t]he purpose of [the doctrine of] equitable estoppel ...
> is to promote equity and justice in an individual case by
> preventing a party from asserting rights under a general
> technical rule of law when his own conduct renders the
> assertion of such rights contrary to equity and good
> conscience.  Equitable estoppel is ... based upon the
> ground of public policy and good faith, and is interposed
> to prevent injustice and to guard against fraud by
> denying to a person the right to repudiate his acts,
> admissions, or representations, when they have been
> relied on by persons to whom they were directed and whose
> conduct they were intended to and did influence.  The
> doctrine of estoppel is far reaching in its effect,
> extending to  real as well as personal estate, and
> embracing almost every enterprise in which men may be
> engaged. [Internal quotes and citations omitted.]

The doctrine of equitable estoppel contains three elements:

> [t]he actor, who usually must have knowledge of the true
> facts, communicates something in a misleading way, either
> by words, conduct or silence.  The other relies upon that
> communication.  And the other would be harmed materially

22

> if the actor is later permitted to assert any claim
> inconsistent with his earlier conduct.

*Talladega City Board Of Education v. Yancy*, 682 So.2d 33, 36 (Ala.
1996)(citing Dobbs, *Remedies* § 2.3 (1973)).

The Supreme Court of Alabama has held that, as a general rule,
the doctrine of equitable estoppel "is not applicable to the state,
to municipal subdivisions, or to state created agencies." *Marsh v.
Birmingham Board of Education*, 349 So.2d 34, 36 (Ala. 1977).
"Persons dealing with agencies of government are presumed to know
the legal limitations upon their power and cannot plead estoppel on
the theory that they have been misled as to the extent of that
power." *Id.* (quoting *City of Mobile v. Mobile Electric Co.*, 84 So.
816 (Ala. 1920)). The doctrine of equitable estoppel, has,
nevertheless, been applied against municipalities "where the facts
and circumstances, in the judgment of the court, warrants its
application." *Marsh*, 349 So.2d at 36 (internal quotation marks and
citations omitted).

At no time did any member of the board of education or the
board itself represent to plaintiff that he would be employed for
the 1995-96 school year. To the contrary, the board clearly stated
to plaintiff in its letter dated May 24, 1995, that his employment
contract would not be renewed for the 1995-96 school year. The
board in no way led plaintiff to believe that it had complied with

23

all the formalities necessary for his reemployment.

Plaintiff argues the representations made by Superintendent Davis, Principal Pace, and Custodial Supervisor Leon Davis were those of agents of the board of education. He claims that, because of these representations, he turned down an employment opportunity in Oklahoma. The record before the court indicates otherwise, however. Plaintiff's stated reason for not accepting the position with TCI Construction in Oklahoma was "I have a family." Moreover, as stated previously, joint action between the superintendent and the board of education is necessary to legally employ an individual with a public school system. No action by any employee of the board is alone sufficient to form a binding employment contract.

Applying the elements of estoppel set forth above, this court concludes that the Decatur City Board of Education did not engage in conduct that concealed a material fact, and that was calculated to induce the plaintiff to change his position in reliance on the facts as he mistakenly thought them to be. This court also concludes that the evidence does not support a finding that plaintiff, in reliance on the board's conduct, changed his position to his detriment.

Plaintiff also has asserted the doctrine of equitable estoppel as a cause of action, rather than a defense to the defendant's argument. The Supreme Court of Alabama has held, however, that

24

"[t]he doctrine of estoppel under our decisions is protective only and is to be invoked as a shield and not as a weapon of offense. It is not effective to create a cause of action and 'should not in any case be made the instruments of gain or profit.'" *Penn Mutual Life Insurance Company of Philadelphia v. Mallory*, 50 So.2d 740, 744 (Ala. 1951)(citations omitted). Defendant's motion for summary judgment as to Claim IV is therefore due to be granted.

## C.    Breach of Contract

In order to breach a contract, a valid contract must first exist.    Plaintiff argues the actions by Superintendent Davis, Principal Pace, and Custodial Supervisor Leon Davis created an enforceable employment contract, and that his termination on October 4, 1995 breached this employment contract.

As previously discussed, however, this court has concluded the Decatur City Board of Education did not "reemploy" plaintiff for the 1995-96 school year.    Therefore, plaintiff cannot maintain a claim for breach of contract.    Accordingly, defendant's motion for summary judgment as to Claim III is due to be granted.

## D.    Fourteenth Amendment - Due Process Claim

Assuming that plaintiff had established his entitlement to protection under the Fair Dismissal Act, he would have acquired a property right in his expectation of continued employment.    In accordance with these rights, a public employer may not deprive an

25

employee of that property right without due process of law. Plaintiff would therefore be afforded the necessary notice and hearing which is prescribed by the Due Process Clause of the Fourteenth Amendment.

The Eleventh Circuit said in *Harris v. Birmingham Board of Education*, 817 F.2d 1525, 1527 (11th Cir. 1987), that "the state statute [Fair Dismissal Act] does not define the process due under the federal Constitution. Therefore, even if the state statute has been violated, that does not prove a violation of a federal constitutional right." Plaintiff must show not just a violation of the Fair Dismissal Act, but a constitutional violation in this § 1983 action. The *Harris* court went further to say that the Fair Dismissal Act does not give plaintiff his property interest in receiving notice of his termination. *Id*. at 1528. Thus, the Fair Dismissal Act describes only "the process the state will follow in termination proceedings." *Id*. However, the court emphasized "that the violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution." *Id*.

In the instant action, had plaintiff acquired rights under the Fair Dismissal Act, he would have had the right to notice and a hearing before his termination. In that situation, because

26

defendant did not provide plaintiff with either notice or a hearing, it would have violated the Fair Dismissal Act, along with the Due Process clause of the Fourteenth Amendment.

Nevertheless,  plaintiff did not acquire nonprobationary status.  He therefore did not have the type of constitutional property interest in continued employment that receives protection under the Due Process Clause and is remediable under Section 1983. Thus, defendant's motion for summary judgment as to plaintiff's Due Process claim (Claim VI) is due to be granted and plaintiff's motion for summary judgment of the same claim is due to be denied.

## IV. CONCLUSION

For the foregoing reasons, this court concludes that defendant's motion for partial summary judgment is due to be granted.  Plaintiff's motion for summary judgment is due to be denied.  An appropriate order consistent with this memorandum opinion will be issued contemporaneously herewith.

DONE this __17th__ day of November, 1998.

United States District Judge

27